[No. 1601.]

EARLY EVANS, JR., *v.* THE STATE.

1. THEFT—EVIDENCE.—See the opinion *in extenso* for evidence *held* insufficient to sustain a conviction for theft of an ox.
2. SAME—CHARGE OF THE COURT.—Where, in a trial for theft, it appears that the property was taken under a claim of right, if it appears that the defendant had any fair color of title, or if the title of the prosecutor be brought into doubt at all, the court should direct an acquittal, it being improper to settle such disputes in the form of a criminal proceeding. See the opinion for charges of the court requested, which, embodying the law of the case, and supplying omissions in the general charge, should have been given.

APPEAL from the District Court of Brazos.   Tried below before the Hon. W. E. Collard.

The indictment charged the appellant and Early Evans, sr., with the theft of an ox, the property of Frank Wassaberger. Verdicts of guilty against both, with a term of two years in the penitentiary, was returned by the jury.   Early Evans, sr., was awarded a new trial; which being refused the appellant, he brought this case to this court.

Frank Wassaberger was the first witness for the State.   He testified that in 1881 he owned an ox of the following description: A black stag ox, full horned.   One ear had a tag hanging to it, as though it had been torn by dogs.   It had a white spot in the forehead, and another on the flank, and a white belly. It did not, when the defendant owned it, have the letter E cut in the horn.   The witness knew the defendant, and the defendant knew the witness' ox, having driven him in a wagon, and having seen the witness driving him.   At a time when the witness was working the ox described in his field, the defendant

came to him and said that his father, Early Evans, sr., had lost a steer he had brought with him from Liberty county. He said that the steer his father had lost had the tips of his horns sawed off, and had the letter E cut deep in the horn. In the year 1880, during which the witness owned the black stag steer he has described, the defendant lived near him.

In the year 1881, the steer described strayed off from the witness, and the witness offered W. N. Smith half the value of the steer to find it. In the spring of 1882, Smith reported that he had found the steer in the defendant's possession. Smith and the witness went to see the defendant and his father about the animal, and they refused to surrender the animal. Early Evans, sr., said that the defendant had a bill of sale to the animal, and that it was the same he had brought from Liberty county. The witness there and then recognized the animal claimed by defendant and his father as his, and as the one he had lost as described. The witness agreed to meet the Evanses in Bryan on the ensuing Saturday, and arbitrate the matter. On Saturday the witness went to Bryan with his witnesses. He saw the defendant and his father in the street near McQueen's store. The defendant then said to the witness: "The steer is not ours, and you can take it; it is yours." His father said: "I knew all the time that the steer was not mine, but my children led me into it, and Mr. Capps sent me word that the steer was eating his cotton seed, and to take it away if it was mine. I told my son Early to go after it, and he brought it home. We would not have taken it, but we wanted an ox to work." The defendant was present during this conversation between his father and the witness. The Evanses then asked the witness not to prosecute them, but the witness told them that he would not compromise with cow thieves. Nine or ten persons were present. The witness was not excited, nor did he threaten the defendant or his father.

From this conference the witness went to the court house and made complaint against the two Evanses. The old man was arrested, but the defendant, seeing the approach of the sheriff, mounted his horse and escaped. McQueen requested the witness to sign a paper agreeing to surrender the steer whenever the defendant or the old man should be able to prove property in the animal. This paper the witness signed readily, inasmuch as he knew the steer was his property, and that the defendant nor his father could prove a title to it. Subsequently, the steer

got away from the witness, and, the witness had been informed, was now in the possession of the defendant and his father. The defendant told the witness, when he was looking for his steer, that his steer had large holes bored in his horns. When the witness recovered the steer he lost, it had large holes through its horns that were not there when witness had it. The tips of the horns had also been sawed off. The defendant said that he had sawed and bored the horns. Witness had never consented to the taking of his steer by the defendant, his father, or other person.

W. N. Smith, for the State, testified that he knew Wassaberger's ox well. That ox got away from Wassaberger in 1881, and he offered the witness ten or twelve dollars to recover him. Here the witness described the animal as Wassaberger had described him. In the spring of 1882, the witness found the ox in the possession of Early Evans. Evans claimed the ox, and said that he purchased the animal in Liberty county. He did not produce a bill of sale. The witness reported to Wassaberger, and returned with that gentleman to see the Evanses about the animal. The Evanses refused to surrender the ox, but both parties agreed to meet in Bryan on the following Saturday and arbitrate the question of ownership. The witness accompanied Wassaberger to Bryan on Saturday, and was present at the interview between Wassaberger and the Evanses. The witness's account of that interview was consistent with that of Wassaberger. No excitement attended the transactions in Bryan, and Wassaberger did not threaten the Evanses.

L. P. Smith, sr., testified for the State, that he was present at the interview between the Evanses and Wassaberger, in Bryan. He detailed the occurrences exactly as they were detailed by witnesses Wassaberger and Smith. He knew that the ox surrendered on that day by the Evanses was Wassaberger's ox. He described Wassaberger's ox exactly as Wassaberger had, and said that he examined the ox in Bryan on the day referred to, and found the various marks he had described as distinguishing Wassaberger's ox. He saw also that a small hole had been bored in each horn, and that the tips of the horns had been sawed off.

Several other witnesses, describing the Wassaberger ox as Wassaberger had, testified that the animal surrendered by the Evanses in Bryan was the Wassaberger ox. Some of them were present at the interview between the parties on that day, and

corroborated the previous witnesses as to what transpired. One witness stated that when the defendant was hunting for his alleged lost ox, which he claimed to have bought in Liberty county, he gave witness a description of the animal which in no wise fitted the Wassaberger ox.

Charley Capps, the first witness for the defense, testified that he knew the animal in question. He was a black stag with a little white on him. He ran with witness's stock, on Little Brazos river, in 1880, 1881 and 1882, and was a bad fence breaker. The witness was complaining of trouble the ox occasioned him, when some one told him that he belonged to Early Evans, sr. Thereupon he sent Evans word to come and get the animal, or he, the witness, would kill it. This was in 1882. Soon after that, defendant came for the animal, and said, as soon as he saw it, that the ox was his father's, and had been by him purchased, in 1879, in Liberty county; that his father worked it that year on G. W. Smith's place, on the river, and that it had strayed off. The witness, requested by the defendant, went with him to the prairie, assisted him in roping the animal and driving it home. Witness was quite positive that the animal came to the range spoken of in 1880, for he then ranged with the witness's stock, and annoyed him very much. After the steer was taken from the range about witness's place, the Evanses worked him regularly. They used him in hauling cotton to the witness's gin where a great deal of cotton was brought; they plowed with him, and worked him to Bryan, and when not using him, they turned him out on the range, necked to a steer belonging to Early Evans, sr., and kept him belled. They always claimed him as belonging to Early Evans, sr., and as the same bought by him in Liberty county, in 1879, and worked that year on G. W. Smith's place.

G. W. Smith testified, for the defense, that the two Evanses, father and son, moved to his place on the Brazos river, from Liberty county, in 1879; worked on his plantation that year, and next year removed to a place on the Navasota river, and again moved to a place on the Little Brazos, where they now live. When they came to witness's place in 1879, Evans, sr., owned a black ox which he brought from Liberty county. On the morning of the proposed arbitration, Early Evans came to the witness in Bryan and asked him to examine the ox. He told the witness that Wassaberger claimed him, and that he wanted witness to see if he could identify the animal. Witness examined the

animal then, and though he would not absolutely swear to his identity, he would swear that, to the very best of his knowledge and belief, that black ox was the same Early Evans worked on his place in 1879. He had all the flesh marks, which witness examined critically.

V. R. Hardy testified, for the defense, that he had supervision of G. W. Smith's plantation in 1879. The two Evanses worked on the place that year, and used a black stag ox they brought with them from Liberty county. That fall the ox strayed off. Some time in 1882, Early Evans, sr., came to the witness's house driving a black stag ox, which he said he brought to see if the witness could identify him. He brought witness a note from McQueen asking witness to examine the animal, and saying that a Dutchman was claiming him. Upon examination, the witness told Evans, sr., that he did recognize the ox as his. On farther examination, the witness told him that the steer had a spot on his side which witness did not remember to have been on the Evans steer, though it might have been there; that his impression was that the ox was the same Evans worked on Smith's place in 1879, although he looked a little larger. Witness replied to Major McQueen's note, which reply he identified in the paper shown him.

T. J. McQueen testified, for the defense, that the defendant worked on his place in 1882. One day Early Evans, sr., Wassaberger and some of the Smiths were in the witness's store, disputing about the ownership of a steer. Wassaberger and Smith claimed it as the property of Wassaberger, and Evans as one he brought from Liberty county in 1879. Witness suggested an arbitration. This was agreed, and Saturday of the week following selected as the day on which to arbitrate the matter. On the day of the arbitration, Early Evans, sr., came into witness's store in great alarm and asked witness to go out into the street; that they were going to take his ox, and that, to save trouble, he had agreed to let Wassaberger have the animal. Witness went out and found a somewhat excited crowd collected. Mr. Wassaberger was cursing and swearing in a terrible rage. Evans, sr., had brought in some witnesses to identify the animal, and the defendant had gone to the country for another. Wassaberger went to the court house, filed a complaint, and had Evans, sr., arrested while the defendant was gone for the witness in the country. It was finally agreed that Wassaberger should take the steer and give bond and security in the sum of twenty-

five dollars, conditioned that it should be void if in a suit to establish the ownership, Wassaberger recovered, otherwise to remain in full force. Evans consented to this arrangement, he said, to avoid trouble. Subsequently the ox escaped from Wassaberger and went back to the defendant's range. Evans, sr., came to see the witness, and said that Wassaberger had brought no suit for the animal, and that it was back in the range, and asked witness what to do about it. The witness went with him to the office of W. G. Taliaferro, who, being consulted and shown the bond, advised Evans to take up the ox and let Wassaberger sue for it.

W. G. Taliaferro, attorney at law, corroborated the witness McQueen as to the advice he gave concerning the ox.

The defense introduced the bond of Wassaberger, conditioned as stated by the witness McQueen, and several witnesses who sustained defendant's reputation for honesty.

The motion for new trial was overruled.

*Ford & Taliaferro*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. Early Evans, sr., and this appellant were jointly indicted, tried and convicted for the theft of one certain head of neat cattle, the property of Frank Wassaberger. On the motion for a new trial the verdict and judgment were set aside as to Early Evans, sr., and overruled as to this appellant.

We have considered the record before us with great care, and our conclusions are that the judgment should be reversed and a new trial awarded. There can be no doubt, from the evidence, that Early Evans, sr., and Wassaberger, the prosecutor, each owned an ox, which in general appearance and flesh marks corresponded with the other, and both animals seem to have gotten away from the possession and control of the owners, that is, they strayed off. Early Evans's ox strayed off in the fall of 1879 or spring of 1880, and Wassaberger's strayed off in the fall of 1881. The ox in controversy, that is, the one about which this prosecution originated, came to the place occupied by one Capps, in 1880, and stayed with his animals until 1882, when he, learning that it belonged to Evans, sr., sent him word to come and get it, and appellant, for his father, did go and get the ox. Sometime afterward, Wassaberger claimed the ox, and Evans,

sr., refusing to give it up, because he claimed it as his own property, the parties agreed to arbitrate the question of title at Bryan, on the ensuing Saturday. On the day named the parties met at Bryan for this purpose, and Wassaberger testifies that soon after he met defendant, defendant said "the steer is not ours, and you can take it—it is yours." And Early Evans said: "I knew all the time the steer was not mine, but my children led me into it, and Mr. Capps sent me word the steer was eating his cotton seed, and if it was mine, to take it away. I told my son Early to go after it, and he brought it home. We would not have taken it, but we needed an ox to work." The statement as to these declarations is corroborated by two or three of the other witnesses for the State. According to McQueen's testimony, Evans, sr., came into his store "in a great state of excitement and alarm, and asked him to go out there; that they were going to take his ox. That he had agreed, to save trouble, to let Wassaberger take him." McQueen says: "I went out and found Wassaberger in a terrible rage, cursing and swearing. There was a crowd collected up round the steer, and some excitement." "It was finally agreed that Wassaberger should take the ox and give bond and security in the sum of twenty-five dollars, conditioned that it should be void if, in a suit to establish the onwnership of the ox, Wassaberger recovered the ox; if not, to remain in full force." We have not the slightest doubt but that the jury seized upon these imputed declarations of Evans, sr., as positive evidence of the guilt of defendants. Without these declarations, and laying them aside, there is not a particle of evidence of guilt; and in our opinion, the evidence outside these declarations would, by preponderance, were it a civil action to try title, establish defendant's claim. Now, what effect should be given to these declarations, or supposed admissions or confessions, in a criminal prosecution for theft? Taking into consideration the attendant circumstances, to wit: the excitement, the cursing and swearing of Wassaberger and friends, the alarm of the Evanses, who were negroes, we say concede that these admissions and confessions were made, are they conclusive evidences of guilt? In Beck's case, 44 Texas, 430, where the defendant had altered the brand, and denied that he had possession of an animal in the owner's brand, Judge Moore says: "The denial of a known fact, and attempt to conceal, destroy or pervert evidence of the owner's title to property, or which is calculated to prove guilt, may, and doubtless often

does, occur from cowardly fear of a groundless charge based upon suspicious circumstances. A fraudulent and dishonest purpose to retain property to which one has no just claim, is by no means inconsistent with the absence of a felonious intent in its original acquisition." How much more frequently does a cowardly fear impel even honest men to yield up their own property to the unjust and illegal demands of others. Besides this, after these admissions, Wassaberger executed a bond with a view to try the right to the property to this same animal, which Evans, sr., still claimed to own. We do not think the evidence to establish theft sufficient, and in consideration of its peculiar character, we are of opinion that the court should have granted a new trial, that the defendant might have had the benefit of the additional newly discovered testimony as to his title and ownership of the ox.

We are also of opinion that the court erred in refusing the several requested special instructions asked in behalf of defendant. The points presented in these instructions were not submitted as clearly, if at all, in the charge as given, and they certainly embodied the law upon material issues in the case, as follows:

"2. If the defendants took the ox under a real claim of title, they are not guilty, and you will acquit.

"4. If it is not shown by the evidence, beyond a reasonable doubt, that the ox taken by defendants was actually and really the property of F. Wassaberger, you must acquit."

Mr. Greenleaf says: "Where the goods were taken under a claim of right, if the prisoner appears to have had any fair color of title, *or if the title of the prosecutor be brought into doubt at all*, the court will direct an acquittal, it being improper to settle such disputes in a form of process affecting men's lives and liberties or reputation." (Note 1, sec. 157, vol. 3, Greenl. Ev., citing 2 East. P. C., 659; *State* v. *Bond,* 8 Iowa, 540.)

For the errors noticed, the judgment is reversed and cause remanded.

*Reversed and remanded.*